**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SHIHWEN SIMON CHAN and SYSONIC ELECTRONICS, INC.,

Plaintiffs,

-v-

SIENNA MARKETING AND CONSULTING, INC. D/B/A CREATIVE CAPITAL SOLUTIONS, CITY CAPITAL NY, LLC, PROVENTURE CAPITAL, LLC, SEAMLESS CAPITAL GROUP, LLC, JOHN DOES 1-10,

Defendants.

Civil Action No. ___________

**COMPLAINT**

Plaintiffs Shihwen Simon Chan ("Chan") and Sysonic Electronics, Inc. ("Sysonic"), by and through their undersigned counsel, allege, upon information and belief, as and for their Complaint against Defendants Sienna Marketing and Consulting, Inc. d/b/a Creative Capital Solutions ("Sienna"), City Capital NY, LLC ("CCNY"), ProVenture Capital, LLC ("ProVenture"), Seamless Capital Group, LLC ("Seamless"), and John Does 1-10 ("Does 1 through 10") (Sienna, CCNY, ProVenture, Seamless and Does 1 through 10 are referred to herein as the "Defendants") as follows:

## NATURE OF THE ACTION

1. This is a fraud, RICO, and bad faith action against the Defendants who pulled a scam on Plaintiffs netting themselves more than $255,000 in under a week based on a claimed "default" that Defendants themselves intentionally orchestrated.[1]

[1] The material facts alleged herein were the basis of a previous action commenced in the California Superior Court for the County of Los Angeles on or about May 18, 2023, captioned *Shihwen Simon Chan and Sysonic Electronics, Inc. v. Sienna Marketing and Consulting, Inc., dba Creative capital Solutions, City Capital New York, ProVenture Capital, LLC, Seamless Capital Group, LLC, and Does 1 through 20*, Case No. 23STCV11208 (the "California

2. In mid-November 2022, Plaintiffs were contacted by Defendant Sienna who offered to help and arrange for quick business financing for Sysonic.

3. Sienna said it had relationships with Defendants CCNY, ProVenture, and Seamless who could lend Sysonic $400,000 within 24 hours. Sienna said that because of the amount, Plaintiffs needed to get the loans from multiple lenders, as opposed to just one.

4. Sienna also told Plaintiffs not to seek bank or other financing because it would take too long and the fees would be too high. Instead, unbeknownst to Plaintiffs, the lenders Sienna was working with were all predatory merchant cash advance ("MCA") companies.

5. Plaintiffs entered into agreements with the companies Sienna introduced and helped set them up with, CCNY, ProVenture, and Seamless, all on November 30, 2022, and received immediate funding in the sum of the $400,000. A few hours later, Sienna withdrew from Sysonic's bank account 10% of that amount ($40,000.00) as its commission.

6. The terms of the loans, couched as "Merchant Agreements" were outrageous, and patently usurious, with repayment due within 50 days of the funding date and effective annualized interest rates of over 300% to more than 450%.

7. But nearly doubling their money in a few weeks wasn't good enough for the Defendants – they were greedier.

8. Thus, on December 1, 2022, ***less than 24 hours after the agreements were signed, each of the three lenders (CCNY, ProVenture, and Seamless) almost simultaneously declared Sysonic in default*** for having received financing from the other two lenders. The lenders then quickly took from Sysonic's bank account nearly $570,000, and then continued to

litigation"). The California litigation was voluntarily dismissed without prejudice on or about March 6, 2024, after the Defendants argued to the Court that the matter was properly venued in New York, not California.

take over $45,000 additionally from Plaintiffs' bank account even after they had received their principal and unconscionably (and illegally) high interest charges and fees.

9. This was a scam, pure and simple, that was highly coordinated between the Defendants and cost Plaintiffs hundreds of thousands of dollars. Defendants should be held accountable.

**THE PARTIES**

10. Sysonic is a California corporation with a principal place of business in Sante Fe Springs, California.

11. Chan is an individual who at all relevant times domiciled in the County of Los Angeles, State of California.

12. Sienna is a New York domestic corporation with a business address in the County of New York, State of New York.

13. CCNY is a New York limited liability company with a registered address in the County of Kings, State of New York.

14. ProVenture is a limited liability company that has registered in both New York and Connecticut, but lists 99 Wall St, Suite 576 New York, NY 10005 on its website (www.proventurecap.com) as its business address.

15. Seamless is a New York limited liability company with a business address within the County of Kings, State of New York. (CCNY, ProVenture, and Seamless are sometimes collectively referred to as the "Lender Defendants").

16. Each of the members of the Lender Defendants is a resident and domiciliary of New York.

17. The true names and capacities, whether individual, corporate, associate or

otherwise of defendants, Does 1 through 10, inclusive, are unknown to Plaintiffs, who therefore sue these defendants by their fictitious names.

18. Plaintiffs are informed and believe, and thereupon allege, that at all times herein mentioned, each of the defendants designated as a fictitiously named defendant is in some manner responsible for the events and happenings, either contractually or tortuously, and caused damage to Plaintiffs. When Plaintiffs ascertain the true names and capacities of Does 1 through 10, they will ask leave of this Court to amend their Complaint by setting forth the same.

19. Plaintiffs are informed and believe, and thereupon allege, that at all times herein mentioned, each of the defendants was and is the agent, servant, employee, representative, partner, subsidiary, affiliate, joint venture or alter-ego of each of the other defendants, were acting within the full course and scope of such relationship, and with the full knowledge, authorization, consent and ratification, either express or implied, of each of the other defendants, and all of the things alleged to have been done by each defendant were done in the capacity of and as agent of the other defendants.

20. Plaintiffs are informed and believe, and thereupon allege, that there is such unity of interest and ownership between Sienna, CCNY, ProVenture, Seamless, and Does 1 through 10, that under the facts and circumstances alleged herein, adherence to the fiction of their separate existence as distinct and apart would sanction fraud or promote injustice.

21. Plaintiffs are further informed and believe, and thereupon allege, that there is such unity of interest and ownership between Sienna, CCNY, ProVenture, Seamless and Does 1 through 10, that each is a mere instrumentality, agency, conduit, or adjunct of the other, and further that a fraud or inequity would result if the acts in question are treated as those of one entity or defendant alone.

## JURISDICTION AND VENUE

22. This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961-68. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

24. Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly transacts business within the State of New York, and/or has purposefully availed himself of the jurisdiction of this Court for the specific transactions at issue.

## FACTUAL BACKGROUND

### A. The Lender Agreements and Repayment of Loan Proceeds

25. Sysonic is in the business of automobile parts and accessories. Chan is or was at all relevant times the sole shareholder and President of Sysonic.

26. In mid-November 2022, Plaintiffs were contacted by telephone by Mike Vilenski ("Vilenski") of Sienna who indicated that he sought out Plaintiffs because he believed Sysonic could use additional funding that he could arrange very quickly.

27. Chan informed Vilenski that Sysonic could use additional capital to purchase inventory and supplies and that, like many similar businesses, a significant amount of Sysonic's sales were around the Christmas holiday season.

28. Sienna, through Vilenski, represented that it had extensive knowledge and experience in assisting business like Plaintiffs' with obtaining appropriate funding opportunities.

29. Sienna further represented that it had worked with numerous lenders previously in situations similar to Plaintiffs' and that Sienna could and would advise Plaintiffs on the appropriate funding agreements to enter.

30. Vilenski stated that he could arrange financing for Plaintiffs within 24 hours, but that due to the amount in need, he would have to make financing arrangements with three lenders he worked closely with.

31. Vilenski also stated that since he had worked closely with each of these three lenders before, it would not be an issue for Plaintiffs to receive funding from multiple companies at the same time.

32. Vilenski also advised Plaintiffs that the financing companies he worked and would make arrangements with for Plaintiffs were more appropriate for Plaintiffs than traditional lenders such as banks.

33. Rather, it turned out, the three lenders Siena lined up to provide financing to Plaintiffs were Merchant Cash Advance ("MCA") companies.

34. Each of the foregoing representations by Vilenski were made by him during telephone conversations with Chan in late November 2022.

35. On November 30, 2022, Plaintiffs and Sienna entered into a service fee agreement whereby Sienna agreed to locate and introduce lenders to Plaintiffs for financing in connection with the operations of their business, in exchange for a commission of ten percent of the financed amount (the "Service Fee Agreement"). Sienna, from its offices in New York, electronically sent this agreement to Plaintiffs, in California, and told Plaintiffs to sign it electronically, which they did.

36. Pursuant to the Service Fee Agreement, on or about November 30, 2022, Sienna

introduced Plaintiffs to three lenders simultaneously: (i) CCNY, (ii) ProVenture, and (iii) Seamless (collectively, the "Lender Defendants") by both email and telephone.

37. At the introductions, Sienna advised Plaintiffs that obtaining funds from all three of the Lender Defendants at the same time would be both acceptable to the Lender Defendants as well as recommended by Sienna since no one lender would provide the entire $400,000 financing.

38. Sienna advised and recommended to Plaintiffs that they should agree to the terms offered by the Lender Defendants and enter into agreements with the three Lender Defendants immediately, as discussed below.

39. The Lender Defendants each sent agreements to Plaintiffs electronically, by email, and told Plaintiffs to sign them electronically, using DocuSign software to electronically sign and transmit the executed the agreements back to the Lender Defendants.

40. In reliance upon Sienna's recommendation and representations, on or about November 30, 2022, Plaintiffs entered into agreements with the Lender Defendants by signing: (i) the Purchase and Sale of Future Receivable between CCNY and Plaintiffs for $150,000 (the "CCNY Agreement"), (ii) the Merchant Agreement between ProVenture and Plaintiffs for $125,000 (the "ProVenture Agreement"), and (iii) the Future Receivables Sale and Purchase Agreement by and between Seamless and Plaintiffs for $125,000 (the "Seamless Agreement") (collectively, referred to as the "Lender Agreements").

41. Pursuant to the Lender Agreements, Plaintiffs obtained loans totaling Four Hundred Thousand Dollars ($400,000) from the three Lender Defendants (the "Loan Proceeds"). For each of the Lender Agreements, interest was charged in a specific percentage that was calculated and added to the repayment amount due to Lender Defendants. Repayment of the

loan on each of the Lender Agreements was due daily.

42. Moreover, Plaintiffs purportedly pledged, as collateral, personal property of Plaintiffs as security for their obligations under each of the Lender Agreements (the "Collateral"). The Lender Agreements further provided for automatic debits from Plaintiffs' bank account of the daily repayment amounts.

43. Plaintiffs relied upon Sienna's superior and expert knowledge and experience concerning the Lender Agreements and would not have entered into those agreements without Sienna's advice and recommendation to do so.

44. On or about November 30, 2022, Sienna withdrew the sum of Forty Thousand Dollars ($40,000) from Plaintiffs' bank account, comprising its 10% commission for the Loan Proceeds under the Service Fee Agreement.

45. On December 1, 2022, the very next day after Plaintiffs entered into all three Lender Agreements, and only after Sienna had withdrawn its 10% commission from Plaintiffs' bank account, all three of the Lender Defendants, CCNY, ProVenture and Seamless, advised Plaintiffs that Plaintiffs were in breach of their respective Lender Agreement due to Plaintiffs' pledging their Collateral as security to the other Lender Defendants.

46. On the same day, December 1, 2022, the Lender Defendants demanded the immediate repayment of the Loan Proceeds plus the calculated interest on the Lender Agreements, and CCNY signed and filed in the Superior Court of the State of Connecticut, a Notice of Ex Parte Request for Prejudgment Remedy seeking a judgment in the amount of $244,850 against Plaintiffs. Pursuant to that filing, CCNY issued a demand on Plaintiffs' bank, Bank of America, to place hold on Plaintiffs' principal business account.

47. As a result of the Lender Defendants' demands, as well as the hold on Plaintiffs'

bank account, Plaintiffs were compelled to immediately repay the Loan Proceeds, along with all contractual interest, by December 5, 2022, in the total sum of $566,063.41.

48. In or about mid-December 2022, the Lender Defendants informed Plaintiffs in writing that they considered Plaintiffs' debts and obligations to them to be fully satisfied.

**B. Lender Defendants' Deduction of Additional Interest**

49. Nevertheless, despite Plaintiffs' repayment of the Loan Proceeds and all interest by December 5, 2022, the Lender Defendants continued to deduct daily payments from Plaintiffs' bank account as follows: (i) $7,510.00 by Seamless; (ii) $16,863.00 by CCNY; and (iii) $24,654.60 by ProVenture, for total sum deducted of $49,027.60.

50. Despite demand by Plaintiffs for return of these improperly deducted funds, the Lender Defendants failed and refused to return any of the sum.

**C. The Lender Agreements Were Unconscionable Contracts of Adhesion**

51. The Lender Agreements are unconscionable contracts of adhesion that were not negotiated at arms-length.

52. Rather, they contain one-sided terms that prey upon the desperation of small businesses, merchants such as Sysonic, and their individual owners and help conceal the fact that the transactions are really loans.

53. Among the one-sided terms, the Lender Agreements include: (a) a provision giving the lender the irrevocable right to withdraw money directly from the merchant's bank accounts, including having to *irrevocably* give the lender Plaintiffs' account usernames passwords, (b) a provision preventing the merchant from transferring, moving or selling the business or any assets without permission from the lender, (c) a one-sided attorneys' fees provision obligating the merchant to pay the lender's attorneys' fees, (d) venue and choice-of-

law provisions requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (e) a personal guarantee, the revocation of which is an event of default, (f) a jury trial waiver, (g) a class action waiver, (h) a collateral and security agreement providing a UCC lien over all of the merchant's assets, and (i) a prohibition of obtaining financing from other sources.

54. The Lender Agreements are also unconscionable because they contain numerous knowingly false statements. Among these knowingly false statements are that: (1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the lender to charge an exorbitant Underwriting Fee or Origination Fee.

55. The Lender Agreements are also unconscionable because they are designed to fail, as they result in a default in the event that the merchant's business suffers any downturn in sales by (a) forcing the merchant to wait until the end of the month before entitling it to invoke the reconciliation provision (a request to adjust Plaintiffs' daily loan repayment amount), (b) preventing the merchant from obtaining other financing, and (c) requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of merchant.

56. Indeed, the fact that the Lender Agreements were designed by the Defendants to fail and cause Plaintiffs to default is clearly evidenced by the fact that they each purported to prohibit Plaintiffs from entered into an agreement with other lenders even though Defendants entire scheme was to have Plaintiffs do just that since Plaintiffs financing needs amounted to $400,000 which each of the Lender Defendants supposedly was not able to fully service,

declared that Plaintiffs were in default the very next day after the loan agreements were executed and Sienna had withdrawn its $40,000 fee for arranging the three loans.

57. The Lender Agreements are also unconscionable because they purport to accelerate the entire debt upon an Event of Default and require the merchant to turn over 100% of all of its receivables if it misses just one fixed daily payment failing to provide a cure period of any sort.

58. In order to evade state usury laws, all three Lender Defendants included a sham reconciliation provision in the agreements to give the appearance that the loans do not have a definite term.

59. However, the Lender Defendants all falsely represented to Plaintiffs, by phone in late November 2022, that the fixed daily payment amount is a good-faith estimate of the percentage of receivables purchased. By doing so, Lender Defendants ensured that if sales decrease, the required fixed daily payments remain the same. In fact, the daily payment is calculated by dividing the payback amount by the intended duration of the loan, which can be cross-checked by dividing the purchased (loan) amount by the amount of the daily payment.

60. Upon information and belief, none of the Lender Defendants have a reconciliation department, do not perform reconciliations, and have never refunded a merchant money as required under their sham reconciliation provision.

61. Thus, the Lender Agreements are intentionally designed to disguise the true nature of the transaction which is a loan.

**D. Fraud, Concealment of Material Facts and Collusion By and Between Defendants**

62. Sienna has previously worked with Lender Defendants and is intimately familiar with their lending and business policies and practices. As such, Sienna knew or should have

known that the Lender Defendants purportedly prohibit pledging collateral to other lenders.

63. Notwithstanding its prior knowledge, Sienna (by and through Vilenski, its funding specialist) represented to Plaintiffs that the Lender Defendants would allow Plaintiffs to pledge the same Collateral for all three Lender Agreements. Sienna's representations were false or Sienna had no basis to believe them to be true.

64. Sienna made these false representations in collusion with Lender Defendants in order to induce Plaintiffs to enter into the Lender Agreements, the Service Fee Agreement, and to collect its 10% commission on the $400,000 in loans to Plaintiffs.

65. The Lender Defendants knew that Plaintiffs had sought and would obtain loans from the other Lender Defendants at the time of the Lender Agreements since Plaintiffs needed $400,000 which, according to Sienna, each of the Lender Defendants could not provide by itself.

66. Plaintiffs are further informed and believe and thereupon allege that each of Lender Defendants knew that Plaintiffs would be required to pledge the same Collateral under each of the three Lender Agreements.

67. Sienna represented in phone calls with Chan on or about November 30, 2022, that they had been in communication with all three of the Lender Defendants and based on those communications and Sienna's relationship with the Lender Defendants, Plaintiffs could and should proceed to execute the three Lender Agreements.

68. The Lender Defendants intended that Plaintiffs pledge the same Collateral under each of the three Lender Agreements in order to claim and compel an immediate default under their respective Lender Agreement.

69. Zack (last name unknown) and Joel Geta represented to Plaintiffs that they were the persons with authority to negotiate the terms and conditions and execute the CCNY

agreement on behalf of CCNY.

70. Samuel Stem represented to Plaintiffs that he was the person with the authority to negotiate the terms and conditions and execute the ProVenture Agreement.

71. Avi Dahan represented to Plaintiffs that he was the person with the authority to negotiate the terms and conditions and execute the Seamless Agreement.

72. All of the communications between Plaintiffs and the Defendants were in November-to-early December 2022 and were by telephone, text and email. Plaintiffs were in California at all times during those communications, and upon information and belief, Defendants were all in New York at those times.

73. The Lender Defendants by and through their representatives knew that Plaintiffs were entering into a Lender Agreement with the other Lender Defendants in which Plaintiffs would be required to pledge the Collateral, but concealed the material fact that Plaintiffs were prohibited from pledging the Collateral for each other's Lender Agreements and that they intended to declare Plaintiffs to be in default as soon as the Lender Agreements were signed.

74. At no time during the discussions or executions of the Lender Agreements did anyone from Sienna or the Lender Defendants advise Plaintiffs of a policy or practice prohibiting pledging of the Collateral to more than one lender and, in fact, each of the Defendants encouraged Plaintiffs to enter into the respective Lender Agreements despite their knowledge that Plaintiffs would be in immediate default.

75. The Lender Defendants concealed these material facts in order to induce Plaintiffs to enter into the Lender Agreements.

76. Lender Defendants further concealed the fact that they then intended to declare an immediate default against Plaintiffs and collect the amount due including all interest which

should have been paid over a longer term.

77. The Lender Defendants conspired and knew, but concealed, the fact that they intended to deem Plaintiffs in default immediately upon the execution of the Lender Agreements, and Sienna and Lender Defendants nevertheless coerced Plaintiffs into entering into the Lender Agreements for the express purpose of unlawfully and wrongfully declaring them to be in default and collecting interest on the Loan Proceeds before their due date, and Sienna collecting its 10% commission ($40,000).

78. Each of the Defendants were aware of the others' plan to coerce Plaintiffs into entering into the Service Fee Agreement and the Lender Agreements by withholding material information, including the fact that the Lender Defendants intended to declare an immediate default and each of the Defendants conspired with the others to coerce Plaintiffs into entering those agreements so that they could declare Plaintiffs to be in immediate default.

79. Defendants agreed with each other and intended that the fraud be committed.

80. Each of the Defendants represented that Plaintiffs would be able to use the Loan Proceeds for a reasonably sufficient time for Plaintiffs' needs, which Defendants knew at the time would not be possible given their scheme to declare Plaintiffs in immediate default as soon as the Lender Agreements were signed and Sienna had withdrawn its commission.

81. All of the representations by Defendants were made, by phone or electronically, in or about the second half of November 2022.

82. Plaintiffs had possession and use of the Loan Proceeds, or a portion of them, for a period of no more than five (5) days. For that privilege, Plaintiffs paid Sienna commission of $40,000 and the Lender Defendants' interest in the sum of $166,063.41, totaling $206,063.41 in fees and interest.

83. The Lender Defendants then took an additional $49,027.60 from Plaintiffs' bank account after the Loan Proceeds had been repaid.

84. Plaintiffs thus paid the Defendants at least $255,091.01 in addition to repaying the $400,000 principal amount of the loans.

85. Additionally, in order to pay off the Loan Proceeds, Plaintiffs incurred approximately $490,000 in borrowing costs and losses.

**FIRST CAUSE OF ACTION**
**(Violation of RICO, 18 U.S.C. § 1962)**

86. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if set forth in full herein.

87. Many states, including New York, Connecticut, and California, set a maximum limit on the amount of interest that can be charged in connection with providing a loan, with any loan charging interest above that rate being illegally usurious.

88. Thus, California law prohibits charging an interest rate for non-consumer loans more than greater of: (i) 10% per annum, or (ii) the "federal discount rate" plus 5%. *See* Cal. Const. Art. XV, § 1(2).

89. In New York, it constitutes civil usuary to charge more than 16% per annum on a loan and it constitutes criminal usury to charge more than 25% per annum on a loan. *See* General Obligations Law § 5-501; New York Penal Law § 190.40.

90. Defendants issued usurious loans under the guise and pretense of MCA agreements to borrowers, such as Sysonic, facing financial duress and who lack sophistication of experienced borrowers and have little familiarity with the MCA industry.

91. While these agreements are named and purport to be a purchase of receivables, they are actually loans effectively ***charging between 300% and 455% interest*** on an annualized

basis.

92. While the Lender Agreements purport to allow for reconciliation, their actual terms reveal this to be illusory as borrowers are limited in the number of reconciliations that can be requested, and there is no actual promise to reconcile.

93. Rather, the Lender Defendants purposely structured the Lender Agreements to ensure absolute repayment through a sham reconciliation provision, which leaves the loan's term definite as a matter of simple math, and forcing the borrower's principals to personally guaranty the merchant's entire obligations in the event the merchant lacks sufficient receivables to payback the Lenders Defendants on a daily basis.

94. Sienna, the Lender Defendants, and the Doe Defendants constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

95. These Defendants are associated-in-fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of California, New York and other states.

96. For several years, at least, and continuing through the present, the members of the Enterprise have had ongoing relations with each other through, *inter alia*, one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

97. The debts, including such debt evidenced by the Lender Agreements, constitute unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i)

they violate applicable criminal usury statutes and (ii) the rates are more than twice (and, here, more than 15 times) the legal rate permitted under applicable laws such as Cal. Const. Art. XV, § 1(2) and New York Penal Law §190.40.

98. Also, for several years, at least, and continuing through the present, the members of the Enterprise have had ongoing relations through, *inter alia*, one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent and illegal fees through electronic wires.

99. For example, in multiple transactions during the first two weeks of December 2022, the Lender Defendants fraudulently overdrew at least $49,027.60 from Plaintiffs' bank account above and beyond what was purportedly owed under the usurious Lender Agreements through repeated electronic withdrawals; specifically, during the first week of December 2022, Seamless overdrew at least $7,510.00 from Plaintiffs' bank account above what was owed under its Lender Agreement, CCNY similarly overdrew at least $16,863.00, and ProVenture similarly overdrew at least $24,654.60.

100. The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. § 1343, which is "racketeering activity" as defined by 18 U.S.C. § 1961(1). Their repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

101. The Defendants are separate legal entities that have a legal existence separate and apart from the other members of the Enterprise and maintains their own books and records.

102. However, the Defendants each participate in and furthers the interests of the Enterprise by a preplanned scheme of: (i) searching for vulnerable businesses, such as Sysonic, who might be susceptible to Defendants' common scheme; (ii) entering into the so-called

merchant agreements, as well as the Service Fee Agreement, on behalf of the Enterprise; (v) servicing the usurious loans; (vi) setting up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt, exorbitant fees and interest; and (v) obtaining judgments to further collect upon the unlawful debt, exorbitant fees and interest.

103. The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

104. Specifically, members of the Enterprise maintain offices in New York and Connecticut and use personnel in these offices to solicit, originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in California, including Sysonic, and throughout the United States via extensive use of interstate emails, texts, telephone calls, mail, wire transfers and bank withdrawals processed through an automated clearing house.

105. In the present case, all communications between the members of the Enterprise and Plaintiffs were by interstate email, texts, telephone calls, mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to solicit, originate, underwrite, service and collect upon the Agreements, fund the advances under each of the agreements and collect the Daily Payments via interstate electronic ACH debits.

106. In addition, Defendants emailed Plaintiffs copies of the agreements to sign or sent links via email for Plaintiffs to access those agreements, and, at the direction of Defendants, each of the Lender Agreements and Service Fee Agreement was executed in California and sent electronically, through DocuSign, to Defendants in New York and Connecticut.

107. Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial, but no less than the amount of the unlawful debt collected by the Enterprise form Plaintiffs.

108. The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, at least hundreds of thousands of dollars in improperly collected criminally usurious loan payments and the unlawful entry and enforcement of judgments.

109. Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

110. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

**SECOND CAUSE OF ACTION**
**(Conspiracy under 18 U.S.C. § 1962(d))**

111. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if set forth in full herein.

112. Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

113. By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email and telephone call communications among the Defendants concerning the soliciting, underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.

114. Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

115. Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c).

116. In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

117. Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

118. The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

119. Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

120. The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected loan payments.

121. Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

122. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

**THIRD CAUSE OF ACTION**
**(Fraud in the Inducement)**

123. Plaintiffs repeat and reallege the foregoing allegations and incorporate them herein by reference as though set forth in full.

124. As alleged above, Defendants made misrepresentations to Plaintiffs that the Collateral could be pledged for loans other than their respective loan as well as their intention to allow Plaintiffs to use the proceeds from the financing for a reasonably sufficient time for Plaintiffs' needs.

125. More specifically, during their telephone conversations in late November 2022, Sienna, through Vilenski, advised Plaintiffs that the Collateral can be cross-collateralized between the Lender Defendants, that he had worked with the Lender Defendants before, and there would not be a problem with Plaintiffs entering into the Lender Agreements with all three of the Lender Defendants at the same time.

126. Vilenski, who was aware of the terms of those agreements, told Chan that he had spoken to the Lender Defendants and told Plaintiffs to go ahead and sign the three Lender Agreements on November 30, 2022.

127. Defendants made these representations to Chan by telephone in late November 2022 in order to induce Plaintiffs to enter into the Service Fee Agreement and Lender Agreements.

128. In justifiable reliance upon Defendants' representations, Plaintiffs entered into the Service Fee Agreement and the Lender Agreements.

129. The Defendants acted together and in concert to conceal those material facts.

130. Plaintiffs suffered damages as a result of Defendants' misrepresentations in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
**(Fraudulent Concealment)**

131. Plaintiffs repeat and reallege the foregoing allegations and incorporate them herein by reference as though set forth in full.

132. Sienna and Plaintiffs were in a special relationship in that Sienna was retained to act as a broker and adviser for Plaintiffs and had superior knowledge and understanding of the financing market, the Lender Agreements, and terms and intentions of the Lender Defendants.

133. As alleged above, Sienna intentionally failed to disclose the fact that the Lender Defendants prohibited pledging of the Collateral on loans by the three Lender Defendants and that the Lender Defendants could and would declare Plaintiffs in immediate default.

134. Plaintiffs did not know of these concealed facts.

135. Sienna intended to deceive Plaintiffs by concealing the facts.

136. Had the omitted information been disclosed, Plaintiffs reasonably would have behaved differently.

137. Plaintiffs were harmed as a result of Sienna's concealment.

138. Sienna's concealment was a substantial factor in causing Plaintiffs' harm.

139. The Lender Defendants failed to disclose that Plaintiffs' pledge of the Collateral for any loan but their own would render Plaintiffs to be in default under the respective Lender Agreements and that they intended to declare Plaintiffs in immediate default.

140. In a preplanned scheme, the Lender Defendants and Sienna failed to disclose that they knew that Plaintiffs would be in immediate breach by virtue of entering into the Lender Agreements and that each of the Lender Defendants intended to declare Plaintiffs to be in immediate breach.

141. Plaintiffs, the Lender Defendants, and Sienna were in a special relations given the Lender Defendants' and Sienna's superior knowledge and understanding of the financing market, the Lender Agreements, and terms and intentions of the Lender Defendants.

142. Plaintiffs did not know of these concealed facts.

143. The Lender Defendants and Sienna intended to deceive Plaintiffs by concealing the facts.

144. Had the omitted information been disclosed, Plaintiffs reasonably would have behaved differently.

145. Plaintiffs were harmed as a result of the concealment.

146. The Lender Defendants and Sienna's concealment was a substantial factor in causing Plaintiffs' harm.

147. The Defendants acted together and in concert to conceal those material facts.

148. Plaintiffs were harmed by Defendants' wrongful conduct in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
**(Common Law Conspiracy to Defraud)**

149. Plaintiffs repeat and reallege the foregoing allegations and incorporate them herein by reference as though set forth in full.

150. Defendants were aware that the others planned to defraud Plaintiffs into entering into the Service Fee Agreement and the Lender Agreements.

151. Defendants agreed with each other and intended that the fraud be committed.

152. Defendants presented Plaintiffs with the Service Fee Agreement and the Lender Agreements in order be able to declare Plaintiffs to be in immediate default and made

misrepresentations and/or concealed material facts in order to induce Plaintiffs to enter into those agreements.

153. Plaintiffs were harmed as a result of Defendants' wrongful conduct in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**(Negligent Misrepresentation)**

154. Plaintiffs repeat and reallege the foregoing allegations and incorporate them herein by reference as though set forth in full.

155. As alleged above, Plaintiffs and Defendants were in a special relationship where Defendants possessed unique or specialized expertise and/or were in a special position of confidence and trust with the Plaintiffs which justified Plaintiffs relying on the representations made by Defendants.

156. As alleged above, Defendants made representations to Plaintiffs that were false and/or without any reasonable basis to believe they were true.

157. Defendants made these representations without any reasonable basis to believe they were true.

158. In reasonable and justifiable reliance upon Defendants' representations, Plaintiffs entered into the Service Fee Agreement and the Lender Agreements.

159. Plaintiffs suffered damages as a result of Defendants' false representations.

160. Plaintiffs were harmed by Defendants' wrongful conduct in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**(Breach of Fiduciary Duty - Against Sienna and Does 1 through 10, inclusive)**

161. Plaintiffs repeat and reallege the foregoing and incorporate them herein by reference as though set forth in full.

162. As alleged above, Sienna was Plaintiffs' broker and had a fiduciary duty to act with the utmost good faith in the best interests of Plaintiffs.

163. In their capacity as Plaintiffs' fiduciary, Sienna advised Plaintiffs to enter into the Lender Agreements. Sienna further advised Plaintiffs that Plaintiffs could pledge the Collateral for each separate loan in the three Lender Agreements.

164. At no time did Sienna advise Plaintiffs that concurrently pledging the Collateral for the loans on the three Lender Agreements would be deemed a breach of each of the Lender Agreements.

165. As a result of Sienna's representations, Lender Defendants deemed the Lender Agreements in default against Plaintiffs.

166. Sienna failed to act as a reasonably careful broker would have acted under the same or similar circumstances.

167. Plaintiffs were harmed by Sienna's conduct described herein in an amount not yet ascertained, but subject to proof at trial and in no event less than the jurisdictional limit of this court.

168. Sienna's conduct was a substantial factor in causing Plaintiffs' harm.

169. In performing the acts alleged herein, Sienna intentionally misrepresented to or concealed from Plaintiffs material facts known to Sienna, with the express intention of causing Plaintiffs harm. Such conduct was willful, wanton, and malicious, thereby justifying punitive damages.

170. Plaintiffs were harmed by these Defendants' wrongful conduct in an amount to be proven at trial.

**EIGHTH CAUSE OF ACTION**
**(Breach of Covenant of Good Faith and Fair Dealing - Against Lender Defendants)**

171. Plaintiffs repeat and reallege the foregoing and incorporate them herein by reference as though set forth in full.

172. As alleged above, Lender Defendants and Plaintiffs entered into the Lender Agreements.

173. Plaintiffs did all, or substantially all of the significant things that the Lender Agreements required them to do.

174. All conditions required for Lender Defendants' performance had occurred.

175. Lender Defendants wrongfully declared defaults under the Lender Agreements and placed a wrongful hold on Plaintiffs' bank account.

176. Plaintiffs were compelled to repay the Loan Proceeds plus all interest prior to the agreed upon repayment date.

177. Plaintiffs were prevented from receiving the benefits under the Lender Agreements.

178. The Lender Defendants overdrew funds from Plaintiffs' bank account(s) beyond what was provided for in the Lender Agreements.

179. By their conduct, Lender Defendants did not act fairly and in good faith.

180. Plaintiffs were harmed by Lender Defendants' wrongful conduct in an amount to be proven at trial.

**NINTH CAUSE OF ACTION**
**(Unjust Enrichment)**

181. Plaintiffs repeat and reallege the foregoing allegations and incorporate them herein by reference as though set forth in full.

182. Defendants had promised that Plaintiffs would receive $400,000 in funding and would be able to have use of those funds until they were paid back over the course of a number of weeks or longer.

183. However, Defendants immediately declared Plaintiffs in default and took or required Plaintiffs to send them $206,063.41 (in addition to repayment of the $400,000 principal amount of the loans), and Plaintiffs had use of the loan proceeds for less than five days.

184. Defendants charged Plaintiffs illegal, excessive, and unconscionable interest rates and fees.

185. Defendants also overdrew from Plaintiffs' account more than $49,027.60 beyond what they claimed to be entitled to and have refused to return those funds.

186. The defendant retained those funds and have been unjustly enriched at the Plaintiffs' expense.

187. It is against equity and good conscience to permit Defendants to retain what they withdrew from Plaintiffs' account beyond the principal amount of the funding.

188. Plaintiffs have been damaged by Defendants' wrongful conduct in an amount to be proven at trial.

**TENTH CAUSE OF ACTION**
**(Unfair Business Practices in Violation of**
**California Business and Professions Code § 17200)**

189. Plaintiffs repeat and reallege the foregoing allegations and incorporate them herein by reference as though set forth in full.

190. California Business and Professions Code section 17200 et seq. (the Unfair Competition Law or UCL) prohibits any unlawful, unfair or fraudulent business act or practice.

191. Defendants violated the UCL by engaging in unlawful, unfair, and fraudulent business acts or practices, including but not limited to: (i) knowingly and intentionally misrepresenting that the Collateral may be concurrently pledged for multiple loans under the Lender Agreements; (ii) concealing the fact that Lender Defendants would declare PLALINTIFFS in default under the Lender Agreement if they concurrently pledged the Collateral for multiple loans; (iii) deducting payments from Plaintiffs' bank accounts despite Plaintiffs' full repayment of all balances due under the Lender Agreements; and (iv) refusal to repay the interest paid by Plaintiffs under the Lender Agreements or the commission under the Service Fee Agreement.

192. As a direct and proximate result of Defendants' conduct, Defendants have unjustly profited and enriched themselves at Plaintiffs' expense. Plaintiffs are entitled to damages, disgorgement, restitution, and injunctive relief.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants, as follows:

A. Actual and consequential damages in an amount subject to proof at trial, but not less than $745,091.01, trebled;

B. Pre-judgment interest on all said damages at the maximum legal rate;

C. Exemplary and punitive damages according to proof;

D. Equitable remedies of rescission, disgorgement, restitution, and constructive trust;

E. Reasonable attorneys' fees where allowed by law;

F. Costs of suit incurred herein; and

G. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: Englewood Cliffs, New Jersey
May 28, 2024

HUR, LASH & CHOE, LLP

By: /s/ *Robert L. Lash*
Robert L. Lash
Scott K. Hur
*Attorneys for Plaintiffs*
600 Sylvan Avenue Suite 109
Englewood Cliffs, NJ 07632
Tel: (212) 468-5591
rlash@hlnylaw.com
shur@hlnylaw.com